**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SUZANNE B. SMITH,**<br><br>Plaintiff,<br><br>*v.*<br><br>**WILLIAM KEITH, Lower Merion Police Officer**, et al.,<br><br>Defendants. | **CIVIL ACTION**<br><br>**NO. 25-6239-KSM** |

# MEMORANDUM

**MARSTON, J.** **September 30, 2026**

Pro se Plaintiff Suzanne Smith claims her constitutional rights were violated in November 2023 when Lower Merion Police Officer William Keith took her to Montgomery County Emergency Services ("MCES") for an involuntary mental health evaluation and MCES physicians held her for inpatient treatment for around 14 days. (*See generally* Doc. No. 13.[1]) After she was released, Smith filed this case against Officer Keith, Lower Merion Township, MCES, MCES physicians Dr. Priyankar Sarkar and Dr. Jordan D. Santina, Montgomery County, Robert H. Lefevre, Esquire, the Commonwealth of Pennsylvania, and unnamed John Doe

[1] Smith filed her initial Complaint (Doc. No. 1) on October 31, 2025, and five days later, she filed her First Amended Complaint (Doc. No. 9), as is allowed under Federal Rule of Civil Procedure 15. *See* Fed. R. Civ. P. 15(a)(1)(A) ("A party may amend its pleading once as a matter of course no later than . . . 21 days after serving it."). Nine days later, she filed a Second Amended Complaint (Doc. No. 11), and three days after that, she filed the most recent Third Amended Complaint (Doc. No. 13). Because Smith did not have "the opposing party's written consent or the court's leave" when she filed these latter two amendments, neither was proper. Fed. R. Civ. P. 15(a)(2). Nevertheless, because Defendants treat the Third Amended Complaint as the operative pleading for purposes of their motions to dismiss (*see* Doc. Nos. 17, 19–21), this Court will as well.

Officers, who Smith describes as having "egged [Office Keith] on." (*Id.*)[2] Before the Court are motions to dismiss filed by the Commonwealth (Doc. No. 21); the County and Attorney Lefevre (collectively, the "County Defendants") (Doc. No. 19); MCES, Dr. Sarkar, and Dr. Santina (collectively, the "MCES Defendants") (Doc. No. 17); and the Township, Doe Defendants, and Officer Keith (collectively, the "Township Defendants") (Doc. No. 20). Smith opposes those motions. (Doc. Nos. 29–34, 39.) For the reasons discussed below, the motions to dismiss are granted.

## I. BACKGROUND FACTS

The allegations in Smith's Third Amended Complaint are disjointed and somewhat difficult to follow. Nevertheless, taking those allegations as true, as the Court must at this stage, the relevant facts are as follows.

Smith is a self-described 78-year-old, transsexual woman. (Doc. No. 13 at 1.) Although she claims to be a resident of New Hampshire, Smith has worked as an IT specialist in Philadelphia since 2015 and appears to maintain a part-time residence in the greater Philadelphia area. (*Id.* at 1–2, 52.)[3] All the incidents described in her Third Amended Complaint appear to

---

[2] Smith is no stranger to this Court. In December 2021, she brought a similar case against the Commonwealth, Lower Merion Township, MCES, and individual defendants who were involved in her involuntary mental health examination in June 2021. *See Smith v. Pennsylvania*, No. 21cv5473, 2022 WL 3139854 (E.D. Pa. Aug. 4, 2022). Her claims in that action were dismissed with prejudice. *See id.* at *15.

[3] The Third Amended Complaint invokes this Court's federal question jurisdiction. (Doc. No. 13 at 5); *see also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). It does not explicitly invoke the Court's jurisdiction on the basis of diversity. *See* 28 U.S.C. § 1332(a)(1) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."). And even if it had, the Court questions whether diversity jurisdiction is met here. For one, it is unclear whether Smith is a resident of Pennsylvania (as her allegations, Pennsylvania address, and job location suggest) or a resident of New Hampshire (where she claims to vote and hold a vehicle registration). If a resident of Pennsylvania, the complete diversity requirement is not satisfied. If a resident of New Hampshire, it remains unclear whether the amount in controversy requirement is met. Although Smith's Third Amended Complaint seeks hundreds of millions of dollars in damages, that request is not remotely

have occurred at or near her Pennsylvania residence. Smith claims that since 2021, "she has been harassed and assaulted by a group of hoodlums wielding dangerous, unconventional weapons." (*Id.* at 1.) Smith's "complaints to police were ignored and . . . things came to a head in 2023, when [she] was shot at on 3 occasions, wounded[,] and suffered hundreds [of] bloody bites all over her body from tiny chigger spiders that [the] hoodlums put into her new car." (*Id.*)

At some point after these incidents, "PA police 302/303'd" Smith. (*Id.*) Smith's use of "302/303" refers to Pennsylvania's Mental Health Procedures Act ("MHPA"), which authorizes the "involuntary examination and treatment" of a person when he or she "is severely mentally disabled and in need of immediate treatment." 50 Pa. Stat. & Cons. Stat. § 7301(a); *see also Doby v. DeCrescenzo*, 171 F.3d 858, 867 (3d Cir. 1999) ("Section 7302 of the MHPA permits the issuance of a warrant for an involuntary emergency examination.").[4] "A person is severely mentally disabled," under the statute "when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or himself." 50 Pa. Stat. & Cons. Stat. § 7301(a). An individual is a "[c]lear and present danger to h[er]self" if, for example, in the last 30 days, "the person has acted in such manner as

---

credible in this case where the only injuries to Smith (as opposed to her medical insurer) are emotional and reputational. *See Jaconski v. Avisun Corp.*, 359 F.2d 931, 937 (3d Cir. 1966) (explaining that the "jurisdictional amount in controversy . . . is to be ascertained . . . by the amount demanded by [the plaintiff], *if that demand is found to have been made in good faith*." (emphasis added)); *see also, e.g.*, *DePhillips v. Equifax Inc.*, No. 22cv3247, 2023 WL 238824, at *3 (D.N.J. Jan. 18, 2023) ("Plaintiff has failed to establish the jurisdictional amount in controversy . . . . Plaintiff's assertion that he is entitled to a multiple of $75,000,000 as relief for a purported breach of contract claim is simply preposterous based on the limited facts alleged. Additionally, Plaintiff's other allegation—that he is 'personally, financially, socially[,] and economically injured by this data breach in that he now does NOT know who may have his personal data or where his data is being used'—does not provide sufficient information . . . to enable this Court to exercise subject matter jurisdiction." (cleaned up)).

[4] Smith claims *Doby* is invalid because "no court can modify the U.S. Constitution" (Doc. No. 29 at 11), but as this Court previously explained to Smith, we are *required* to follow published opinions of the Third Circuit, including *Doby*, *see Smith*, 2022 WL 3139854, at *5 n.7.

to evidence that [s]he would be unable, without care, supervision and the continued assistance of others, to satisfy h[er] need for nourishment, personal or medical care, shelter or self-protection and safety." *Id.* § 7301(b)(2). And an individual poses a "clear and present danger to others" if in the last 30 days, the person "has inflicted or attempted to inflict serious bodily harm on another and . . . there is a reasonable probability that such conduct will be repeated." *Id.* § 7301(b)(1).

Pursuant to these provisions, on November 3, 2023, Lower Merion Township Police Officer William Keith drafted an Application for Involuntary Emergency Examination ("302 Application") that included the following narrative as to why he believed Smith's involuntary examination was warranted:

> Suzanne Smith is a known party to Lower Merion Police Department and this Officer. Smith has displayed persistent paranoid delusions consistently over the past year. To this date, I have received in excess of 30 emails or phone calls from Smith in relation to these delusions. These delusions consist of the fact that she is being targeted by members of the Gambino Crime family, who are attacking her with directed sonic weapons. Smith advises that the members of the Gambino Crime family are breaking into the apartments below or around her and holding the families in those apartments hostage for months on ends [sic] in order to further their attacks on her. Smith claims that she can hear male voices below her talking about killing her and destroying her mental facilities [sic]. Smith is unable to provide anything more than a general description of males despite having view[ed] the males on multiple occasions. Smith also advised that the males are attacking her with chiggers, insects designed to enter and eat away at her [undecipherable]. Smith is fixated that these males reside below her and are holding the families below her hostage against their will despite police interaction with these families and checks on them that are negative. Smith has advised me that in order to avoid the sonic weapons she is/has slept on steel gauge metal sheets in an attempt to block the sonic weapons. Smith also recently advised that she moved apartments in October of this year in an attempt to move away from her attackers, however within a day or two she was feeling the affects [sic] of the sonic weapon. Smith has also reported that she drinks heavily in order to medicate her from [sic] and [she is] using

> alcohol and Valium and Ambien to help her sleep. Smith has also indicated that she has heard voices of men discussing suicide with her in the past. In addition, Smith has stated that she has been attacked in New Jersey and other places with the sonic weapons while driving to the point where she has almost crashed her car.
>
> On this date [November 3, 2023], I received a phone call from DHS Inspector and from the VA Office where she works. The Inspector advised that [when] Smith arrived at work she advised security that she had a [sic] unloaded firearm in her bag. The Security Officer the Inspector that she was told to return the gun to her car per policy and she did without question. The Inspector advised that he spoke with Smith later in the day in order to find out why she brought the gun in regards to her past and she advised that she brought the gun because . . . "[she] is afraid she may not be able to get out of her apartment alive." Smith also advised that the individuals are becoming more impatient in regards to getting to her. The DHS Inspector called me to make me aware of her carrying a gun.
>
> I spoke with Smith on the phone and she advised that she carried a gun to work today because she is worried about an incident that happened last night. Smith stated that last night she overhead [sic] the Gambino crime family trying to convince the female below her to 302 her. Smith stated that there were voices below her from the mafia that she did not recognize and one of them said "I'm not giving up." Smith stated that this morning she was worried about the new voices who she suspects as Latino gang members and because of what they said and the new multiple attackers she would bring her gun with her.
>
> Due to the fact that Smith is now carrying guns in response to her delusions about being attacked with sonic weapons it is this Officers [sic] believe [sic] that she is a danger to herself or other[s].

(Doc. No. 13 at 62–63.)

On this basis, at around 4:45 p.m. on November 3, Officer Keith called Smith and asked her to come to police headquarters for an interview. (*Id.* at 71.) When Smith arrived, Officer Keith placed her in handcuffs before directing other officers to search her car for firearms. (*Id.*) Officer Keith then transferred Smith to MCES, which is a privately owned mental health

treatment facility. (*Id.* at 71; Doc. No. 19 at 8.) After they arrived, Officer Keith added the following paragraph to his 302 Application:

> When Smith was taken into custody she continued to speak about the mafia setting her up. She, unprompted, advised she took the gun to work to protect herself from the mafia and Latinos. A check of her vehicle revealed no weapons, however, numerous boxes of ammunition was [sic] located inside the vehicle.

(Doc. No. 13 at 63.)

Smith arrived at MCES at 7:50 p.m. and was examined at 9:00 p.m. by Defendant Dr. Priyankar Sarkar. (*Id.* at 16, 67.) Dr. Sarkar noted that Smith was "very paranoid . . . guarded and suspicious" and exhibited a "flat affect," "thought blocking," and "poor" "eye contact." (*Id.* at 67.) Smith describes her interview with Dr. Sarkar as including a brief discussion about the night's events:

> Doctor Sarkar just came into an interview room in a locked ward where the plaintiff waited and asked the plaintiff, "what's going on." [Smith responded] with her thoughts on what had happened earlier at police headquarters; that is: (1) that she had been the target of harassment 8 times in her then 76-year life, as a result of her being a transsexual woman (SRS 1970) and this appeared to be one of those times; and (2) that she had been asked by Officer Keith by phone to come to police headquarters after work for an interview but there was no interview and instead police had searched her car for guns and found no guns in her car. She did not know anything because no one was telling her why [s]he was arrested and taken to the mental institution after work.

(*Id.* at 13.) Based on his examination, Dr. Sarkar concluded that Smith was "severely mentally disabled and in need of treatment," such that she "should be admitted to a facility . . . for a period of treatment not to exceed 120 hours," e.g., five days. (*Id.* at 67–68.)

On November 8, 2023, Dr. Jordan Santana,[5] a licensed psychiatrist, petitioned the Court of Common Pleas of Montgomery County to certify extended involuntary treatment for Smith under § 303 of the MHPA (the "303 Petition"). *See* 50 Pa. Stat. & Cons. Stat § 7303(a) ("Application for extended involuntary emergency treatment may be made for any person who is being treated pursuant to section 302 whenever the facility determines that the need for emergency treatment is likely to extend beyond 120 hours."). During the hearing that followed (the "303 Hearing"), Dr. Santana described Smith as "psychotic, paranoid, and delusional"—monikers that Smith vehemently rejects. (Doc. No. 13 at 18.) Officer Keith also testified as to his personal observations, consistent with the narrative in his 302 Application. The 303 Hearing was overseen by Mental Health Review Officer ("MHRO") Robert H. Lefevre, Esquire, and Smith was represented by counsel from the Montgomery County Public Defender's Office. (*Id.* at 83.) MHRO Lefevre found that Smith "is in need of treatment," and accordingly, ordered that she receive "inpatient treatment . . . for a period of 20 days" (the "303 Order"). (*Id.*) It appears that Smith was, however, discharged around nine days later, on November 17, 2023, when the Court of Common Pleas of Montgomery County entered an Order for Involuntary Treatment that once again found Smith "is severely mentally disabled and in need of (continued) treatment," this time in the form of "outpatient" therapy "not to exceed 90 days." (*Id.* at 70.)

## II. PROCEDURAL HISTORY

On October 31, 2025, nearly two years after the incidents described above, Smith filed this civil rights action. (*See generally* Doc. No. 1.) Most of her claims are grounded in 42 U.S.C. § 1983, a federal statute that creates a private cause of action against "[e]very person

[5] Smith refers to this Defendant as "Doctor Jordan D Santina." (Doc. No. 13 at 1, 18.) But the Court will use the spelling provided by Defendant.

who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Smith cites a panoply of federal constitutional provisions that she believes Defendants have violated, including the Fourth Amendment prohibition on unreasonable seizures and the Fourteenth Amendment Due Process Clause.[6] (*See* Doc. No. 13 at 6–11.) Smith also claims that

---

[6] Smith's Third Amended Complaint also asserts that Defendants violated her Second, Fifth, Eighth, and Ninth Amendment rights. But the Fifth, Eighth, and Ninth Amendments are not implicated by her allegations. *See Lekowitz v. Turley*, 414 U.S. 70, 77 (1973) (explaining that the Fifth Amendment "protects the individual against being involuntarily called as a witness against himself in a criminal prosecution" and "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings"); *Romeo v. Youngberg*, 644 F.2d 147, 156 (3d Cir. 1980), *abrogated on other grounds Youngberg v. Romeo*, 457 U.S. 307 (1982) ("[T]he Eighth Amendment, which limits the scope of judicial review of conditions of incarceration for the criminally convicted to a 'cruel and unusual' threshold, is inappropriate in the context of civil as distinguished from criminal confinement . . . ."); *Clayworth v. Luzerne County*, 513 F. App'x 134, 137 (3d Cir. 2013) ("The Ninth Amendment does not independently provide a source of individual constitutional rights."). Accordingly, the Court does not discuss those Amendments further in this Memorandum.

As for the Second Amendment, Smith is correct that the "Pennsylvania legislature explicitly prohibit[s] individuals temporarily committed under Section 302 [and Sections 303 and 304] from owning a gun." *Doe I v. Evanchik*, 355 F. Supp. 3d 197, 223 (E.D. Pa. 2019), *aff'd* 977 F.3d 270 (3d Cir. 2020) (citing 18 Pa. Stat. & Const. Stat. § 6105(4)). But to the extent she challenges the MHPA on its face because it results in the limitation of a committee's Second Amendment right to bear arms, that claim fails. *See Doe I*, 977 F.3d at 274 ("We find no reason to second-guess the adequacy of Pennsylvania's requirement under MHPA § 302 that a physician determine that one is a danger to himself or others as a result of mental illness and is 'severely mentally disabled . . . and in need of immediate treatment.' Thus, once a person has been involuntarily committed under MHPA § 302, that person has joined the class of those historically without Second Amendment rights."); *see also id.* (explaining that "[l]eft without Second Amendment rights" such persons can only challenge the MHPA on the grounds that it "provides inadequate procedure before involuntarily temporarily committing someone" but finding the appellants failed to raise that challenge); *Doe I*, 355 F. Supp. at 223 ("Weighing a Section 302 committee's private interest in owning a gun against the government's prevailing interest in public safety, and given the negligible risk of erroneous deprivation without a pre-deprivation hearing, the Court is not convinced that the Due Process Clause of the Fourteenth Amendment entitles a Section 302 committee to a pre-deprivation hearing before he is divested of his right to own a gun."). Likewise, if Smith means to bring a facial challenge to the Pennsylvania statute that prevents a Section 302 committee from owning a firearm, that challenge fails because Pennsylvania provides "post-deprivation remedies [which] allow a Section 302 committee to restore his state firearm rights, and one post-deprivation remedy [which] allows a Section 302 committee to completely expunge his record, restoring both state and federal firearm rights." *Doe I*, 355 F. Supp. at 224–25 (citing 18 Pa. Stat. & Cons. Stat. §§ 6105(f), 6111.1(e), 6111.1(g)(2)).

certain Defendants defamed her character in violation of 28 U.S.C. § 4101 and retaliated against her in violation of 42 U.S.C. §§ 12203 and 12188 for filing a previous lawsuit against MCES, *see supra* n.2. (Doc. No. 13 at 6, 10.) Finally, Smith brings numerous state law claims, including a claim that the Commonwealth, by passing the MHPA, violated Smith's "common law right to refuse medical treatment." (*Id.* at 8.)

For relief, Smith asks the Court to "expunge" the police and medical records created in connection with this incident.[7] (*Id.* at 25.) She also seeks $25 million from each Defendant as compensatory damages and an additional $25 million from some of the Defendants as punitive damages. (*Id.*) Finally, Smith asks the Court to issue an injunction "barring the Commonwealth of Pennsylvania and those acting under the color of PA State law, from issuing any more mental health warrants under the MHPA." (*Id.*) Defendants have moved to dismiss Smith's Third Amended Complaint in its entirety, arguing that they are immune from suit on many of Smith's

---

Finally, to the extent that Smith means to bring an as-applied Second Amendment challenge against any Defendant, her claim fails because even if the Court credits Smith's assertions that various Defendants "lied while involuntarily committing" her—an allegation at odds with Smith's concession of many of the facts as reported by Defendants—she has not alleged that any individual Defendant personally "prevented h[er] from possessing a firearm." *Davenport v. Pottstown Hospital Co.*, 2017 WL 4467500, at *6 (E.D. Pa. Oct. 6, 2017); *see also id.* at *6 n.87 (noting that an individual previously committed under the MHPA "may have a Second Amendment claim against a state agency" that enforces the Pennsylvania state law prohibiting them from possessing a firearm). The Court also notes that throughout the Third Amended Complaint, Smith frames her Second Amendment claims as sounding in "[c]onspiracy to deprive the plaintiff of her U.S. Second Amendment gun rights." (*See, e.g.*, Doc. No. 13 at 13 (alleging that Officer Keith "acted in concert with others to effectively deprive the plaintiff of her Second Amendment rights by inflammatory false and misleading statements in writing and verbally aimed at her commitment"). But Smith has failed to allege any facts from which a conspiratorial agreement can be inferred. *See Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) ("We have held that to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred."). For these reasons, Smith's Second Amendment claims are dismissed with prejudice as against all Defendants.

[7] Smith also asks the Court to expunge the records related to her previous involuntary evaluation in June 2021. (Doc. No. 13 at 25.) That request is improper. It is not tied to the incident currently before the Court, and in any event, we previously dismissed with prejudice Smith's claims related to the June 2021 evaluation. *See Smith*, 2022 WL 3139854, at *15.

claims and that Smith has failed to show any of the remaining claims are plausible. (Doc. Nos. 17, 19–21.)

## III. LEGAL STANDARDS

The Commonwealth brings jurisdictional challenge under Federal Rule of Civil Procedure 12(b)(1) and all the Defendants challenge the sufficiency of Smith's claims under Federal Rule of Civil Procedure 12(b)(6).

### *A. Federal Rule of Civil Procedure 12(b)(1)*

"Rule 12(b)(1) governs jurisdictional challenges to a complaint." *Williams v. Litton Loan Servicing*, No. 16cv5301, 2018 WL 6600097, at *5 (D.N.J. Dec. 17, 2018). "The Court can adjudicate a dispute only if it has subject-matter jurisdiction to hear the asserted claims." *Id.* (quotation marks omitted). "A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3rd Cir. 2000). Here, the Commonwealth asserts a facial attack, meaning it "contests the sufficiency of the complaint because of a defect on its face." *Williams*, 2018 6600097, at *5 (quotation marks omitted). In reviewing the motion, we consider only the "allegations in the complaint, along with documents referenced therein, in the light most favorable to the nonmoving party," and determine whether they "establish the necessary jurisdiction . . . ." *Myers v. Caliber Home Loans, Seterus, Inc.*, No. 19cv596, 2019 WL 4393377, at *3 (M.D. Pa. Sept. 13, 2019).

### *B. Federal Rule of Civil Procedure 12(b)(6)*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quotation marks omitted). In reviewing a motion to dismiss, the court must accept as true the factual allegations in the complaint and all reasonable

inferences that can be drawn from those allegations. *Id.* However, the court is not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted). And "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"In determining the sufficiency of a *pro se* complaint," like the one before us, we "must be mindful to construe it liberally in favor of the Plaintiff. *Hoist v. New Jersey*, No. 12cv5370, 2013 WL 5467313, at *4 (D.N.J. Sept. 30, 2013) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)). And in resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached to or submitted with the complaint . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *accord Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011).

## IV. DISCUSSION

The Court begins with the arguments for dismissal raised by the Commonwealth, then turns to those raised by the County Defendants, the MCES Defendants, and the Township Defendants in turn.

### *A. The Commonwealth's Motion to Dismiss*

Smith's § 1983 claims against the Commonwealth allege that the Commonwealth's passage and enforcement of the MHPA results in a "[m]assive PA State-wide deprivation of civil rights conferred by the Constitution of the United States of America." (Doc. No. 13 at 23.) She also claims that in this specific instance, the invocation of the MHPA resulted in a violation of Smith's Fourteenth Amendment due process rights. (*Id.*) The Commonwealth argues that it is

immune from suit on these claims in federal court under the Eleventh Amendment. (*See generally* Doc. No. 21 at 6–7.) We agree.

The Eleventh Amendment of the United States Constitution renders unconsenting states immune from private lawsuits in federal court. *See Karns v. Shanahan*, 879 F.3d 504, 512 (3d Cir. 2018) (explaining that the Eleventh Amendment "bar[s] all private suits against non-consenting States in federal court" (quotation marks omitted)); *see also Elman v. United States*, No. 97cv5825, 1998 WL 195905, at *1 (E.D. Pa. Apr. 6, 1998) ("The Eleventh Amendment has been consistently interpreted to immunize an unconsenting state from suits brought in federal courts by her own citizens or citizens of another state."). There are two general exceptions to immunity. "First Congress may abrogate Eleventh Amendment immunity by expressing its 'unequivocal' intent to abrogate pursuant to a valid exercise of power." *Lehmier v. Pa. Fish & Boat Commission*, No. 07cv3275, 2008 WL 11498161, at *2 n.2 (E.D. Pa. July 22, 2008) (quotation marks omitted); *see also Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 (3d Cir. 1996) ("Congress may specifically abrogate the states' Eleventh Amendment immunity."). Second, a state may waive its "sovereign immunity and consent to be sued." *Lehmier*, 2008 WL 11498161, at *2, n.2; *see also Blanciak*, 77 F.3d at 694 ("If a state waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action.").

Here, neither exception applies. First, Congress has not abrogated Eleventh Amendment immunity under § 1983. Section 1983 creates a private cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "[T]he Supreme Court has explicitly held that states are not 'persons' subject to liability under

42 U.S.C. § 1983 in either federal or state forums." *Lehmier*, 2008 WL 11498161, at *2, n.2 (citing *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989)); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120–21 (1984) ("[I]f a § 1983 action alleging a constitutional claim is brought directly against a State, the Eleventh Amendment bars a federal court from granting any relief on that claim."); *Blanciak*, 77 F.3d at 697 ("Since Congress expressed no intention of disturbing the states' sovereign immunity in enacting § 1983, these suits, when brought against a state, are barred by the Eleventh Amendment."). Second, Pennsylvania has declined to waive its Eleventh Amendment immunity. *See* 42 Pa. Stat. & Cons. Stat. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States.").

Because the Commonwealth is immune from suit in this Court, Smith's federal and state claims against it are dismissed. Dismissal is without prejudice to Smith's right to bring these claims in an appropriate state court.

***B. The County Defendants' Motion to Dismiss***

Next, Smith brings § 1983 claims against MHRO Lefevre and Montgomery County for violation of Smith's Fourteenth Amendment right to due process. (Doc. No. 13 at 20–22.) She also brings state law claims for gross negligence, defamation, and false imprisonment. (*Id.*) Her claims are tied to MHRO Lefevre's 303 Order, which authorized Smith's inpatient treatment to continue an additional 20 days. (*Id.*) Smith alleges that the 303 Order was issued after a hearing before a "farcical Kangaroo mental health court where there are no rules of evidence," "where hear-say evidence and name calling based on statistics, rule the day," and where she was "not given an opportunity to cross examine any of the witnesses against her." (*Id.* at 20–21.) And she alleges that the 303 Order resulted in "an additional 7 days of imprisonment" at MCES, and now

her "reputation is destroyed forever." (*Id.*) As for the County, Smith argues that "Montgomery County is the ultimate responsible party for the official behavior of . . . Robert H. Lefevre, Esquire." (*Id.* at 21.) The County Defendants urge the Court to dismiss Smith's claims because MHRO Lefevre is immune from suit and because Smith has failed to allege a plausible constitutional violation or to show that any such violation is attributable to the County. The Court agrees.

**1. <u>MHRO Lefevre</u>**

First, we find that MHRO Lefevre is entitled to absolute quasi-judicial immunity for acts taken in his role as MHRO, including overseeing Smith's 303 hearing and issuing the 303 Order that followed. Despite § 1983's broad terms, "the Supreme Court has held consistently that Section 1983 did not abolish long-standing common law immunities from and defenses to civil suits." *McArdle v. Tronetti*, 961 F.2d 1083, 1084 (3d Cir. 1992) (citing *Burns v. Reed*, 500 U.S. 478 (1991)). This includes judicial immunity, under which "judges are absolutely immune from liability for performing judicial acts." *Id.* at 1084. The Court has no trouble finding that an MHRO is similarly immune from suit for acts taken while performing their official duties.

Because an MHRO is not a judge in title, we must determine whether MHRO Lefevre is entitled to absolute *quasi*-judicial immunity. "As its name suggests, 'quasi-judicial' immunity is a doctrine under which government actors whose acts are relevantly similar to judging are immune from suit." *Dotzel v. Ashbridge*, 438 F.3d 320, 325 (3d Cir. 2006). It attaches "'when a public official's role is functionally comparable to that of a judge,'" meaning "if a state official must walk, talk, and act like a judge as part of his job, then he is as absolutely immune from lawsuits arising out of that walking, talking, and acting as are judges who enjoy the title and other formal indicia of the office." *Id.* (quoting *Hamilton v. Leavy*, 322 F.3d 776, 782 (3d Cir. 2003)); *see also Keystone Redevelopment Partners, LLC*, 631 F.3d at 95 (explaining that the

immunity "flows not from rank or title or location within the Government, but from the nature of the responsibilities of the individual official" (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985))). "Thus, in evaluating whether quasi-judicial immunity grants immunity to a particular official, a court inquires into 'the official's job function, as opposed to the particular act of which the plaintiff complains.'" *Keystone Redevelopment Partners, LLC*, 631 F.3d at 95 (quoting *Dotzel*, 438 F.3d at 325). For this inquiry, the court considers six factors:

> [1] the need to assure that the individual can perform his functions without harassment or intimidation; [2] the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; [3] insulation from political influence; [4] the importance of precedent; [5] the adversary nature of the process; and [6] the correctability of error on appeal.

*Id.* (quoting *Cleavinger*, 474 U.S. at 202). Here, all six factors weigh in favor of granting immunity.

Under the first factor, we note that an MHRO is tasked with determining whether an individual is "severely mentally disabled and in need of treatment," such that they are subject to continued *involuntary* treatment. *See* 50 Pa. Stat. & Cons. Stat. § 7303(c). It seems not only possible, but likely, that persons "targeted" by these types of proceedings may "well act angrily and may seek vengeance in the courts." *Butz*, 438 U.S. at 512. And it is equally likely that dire consequences could result if an MHRO, for fear of such retaliation, fails to continue the treatment of a person who is a present danger to themselves or others. Accordingly, the Court finds that there is a "need to assure that the individual [serving as MHRO] can perform his functions without harassment or intimidation." *Keystone Redevelopment Partners, LLC*, 631 F.3d at 95.

Under the second factor, the Third Circuit has indicated that "the more the activity looks judicial, the more weight is to be given to officials' freedom from personal liability." *Id.* at 97.

In the context of the MHPA, it is telling that a 303 hearing and determination can be made by either "a judge of the court of common pleas *or* by a mental health review officer." *See* 50 Pa. Stat. & Cons. Stat. §7109(a) (emphasis added); *id.* 7303(b)–(c); *cf. McArdle*, 961 F.2d at 1084 (finding that witness who testified before the court about the plaintiff's mental health at the court's direction was "an integral part of the judicial process and is protected by the same absolute judicial immunity that protects Judge Connelly," the judge overseeing the commitment hearing). The MHRA also provides numerous procedural safeguards: (1) the 303 hearing must occur within 24 hours after the filing of a 303 petition; (2) the subject of the 303 petition is entitled to counsel; (3) at the beginning of the 303 hearing, the MHRO must "inform the person of the nature of the proceedings"; (4) the individual or their attorney shall "have the right to ask questions of the physician and of any other witnesses and to present any relevant information"; (5) "a record of the proceedings . . . shall be made" and held for at least one year; (6) the MHRO must provide in writing the "reasons that extended involuntary emergency treatment is necessary," (7) continued treatment cannot extend beyond 20 days without further findings; and (8) the subject of the 303 petition is entitled to appeal the MHRO's findings to the Pennsylvania Court of Common Pleas. *See generally id.* §§ 7109(b), 7303; *see also T.R. v. County of Delaware*, No. 13cv2931, 2014 WL 4186510, at *1 (E.D. Pa. Aug. 22, 2014) ("Under Section 303 of the MHPA, a person is afforded certain protections before they can be committed, including appointment of counsel, and the right to challenge the doctor's Section 303 recommendation at a hearing before a Mental Health Review Officer."). Accordingly, this factor too supports immunity. *See, e.g.*, *Keystone Redevelopment Partners, LLC*, 631 F.3d at 97–98 ("These safeguards were found to be present in *Dotzel*, just as they are relevant here. In particular, in *Dotzel* there were requirements for (1) notice to the parties and the public, (2)

public hearings, (3) specific procedures for conducting hearings, (4) the right to counsel, (5) the use of subpoenas and oaths, (6) the issuance of written decision, and (7) the preparation of transcripts." (discussing *Dotzel*, 438 F.3d at 326)).

The remaining four factors also support a finding of immunity. Under the third factor, the MHRO is selected by the Pennsylvania Court of Common Pleas, and is, thus, an extension of that court, who is "adequately insulated from political pressures." *Keystone Redevelopment Partners, LLC*, 631 F.3d at 98. Under the fourth factor, although it is unclear whether an MHRO considers "precedent" in the judicial sense, the MHPA does require MHROs to review all "information relevant to whether the person is severely mentally disabled and in need of treatment," to hold a hearing on that issue, and to issue a written determination of their findings. *See* 50 Pa. Stat. & Cons. Stat. § 7303(c)–(d); *Keystone Redevelopment Partners, LLC*, 631 F.3d at 98 (finding this factor satisfied where the board was required "by law to reach its decisions based on certain statutorily delineated criteria" and to "issue a written decision"). Last, under the fifth and sixth factors we reiterate: (1) the adversarial nature of the 303 hearing, during which the subject of the 303 petition is represented by counsel and given an opportunity to question witnesses, and (2) the statutory right to appeal MHRO decisions to the Pennsylvania Court of Common Pleas. *See* 50 Pa. Stat. & Cons. Stat. 7303; *see also Keystone Redevelopment Partners, LLC*, 631 F.3d at 100 (emphasizing under the fifth factor the importance of cross examination, weighing evidence, issuing written decisions, administering oaths and the like"); *id.* ("[A] formal appellate procedure is probably the single most court-like feature a government body can have." (quoting *Dotzel*).)

Because all six factors weigh in favor of finding judicial immunity extends to MHROs, the Court finds MHRO Lefevre is absolutely immune from suit on claims arising out of acts

taken pursuant to his official duties. Smith's federal and state claims against MHRO Lefevre are dismissed with prejudice.[8]

### 2. **Montgomery County**

Smith's claims against Montgomery County are tied to MHRO Lefevre's conduct, with Smith contending that "Montgomery County is the ultimate responsible party for the official behavior of . . . Robert H. Lefevre, Esquire." (Doc. No. 13 at 21.) But as this Court has explained to Smith before, this is "essentially a claim for *respondeat superior* liability, which cannot serve as a basis for a § 1983 claim against a local government." *Smith*, 2022 WL 3139854, at *15 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)). Instead, a municipality, like the County, may be sued under § 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. The only policy that Smith identifies in the Third Amended Complaint is the County's "voluntary policy" of "opt[ing]-in to have the [MHPA] to be in effect in Montgomery County." (Doc. No. 13 at 21; *accord* Doc. No. 32 at 3.) But when a local government is "merely enforcing state law, without adopting any particular policy of its own, it cannot be held liable under the *Monell* line of cases." *Doby*, 171 F.3d at 867.[9]

[8] MHRO Lefevre also argues that he is entitled to immunity under the MHPA, which states any "judge or mental health review officer shall not be civilly or criminally liable for any actions taken or decisions made by him pursuant to the authority conferred by this act." 42 Pa. Stat. & Cons. Stat. § 7114(b). Again, we agree, and this provision serves as an additional basis for finding MHRO Lefevre is entitled to immunity on Smith's state law claims.

[9] Although "[t]he *Doby* court went on to observe that a local government might be liable under *Monell* if it 'has some discretion in deciding how to implement' state law," Smith does not argue that the County has exercised its discretion in any manner that strays from the terms of the MHPA, let alone that it has a policy or custom of doing so. *Rios v. Martin*, No. 24cv1399, 2025 WL 2484260, at *6 (M.D. Pa. Aug. 28, 2025) (quoting *Doby*, 171 F.3d at 867).

In addition to seeking dismissal of Smith's § 1983 claim, the County also seeks dismissal of Smith's state law claims for gross negligence, defamation, and false imprisonment against the County. (Doc. No. 19 at 20–21.) But here, Smith has not responded to the County's arguments, so the Court finds those claims abandoned. *See Dooley v. Wetzel*, No. 18cv1310, 2022 WL 21757166, at *4 (M.D. Pa. Dec. 29, 2022) ("The filing of a brief in opposition to a motion to dismiss that fails to respond to a substantive argument to dismiss a particular claim results in the waiver or abandonment of that claim."); *see also, e.g.*, *Breslow v. Carvana Co.*, No. 21cv4915, 2022 WL 18585319, at *1 n.1 (E.D. Pa. Aug. 1, 2022). And when a plaintiff has abandoned their claims, dismissal is with prejudice. *See, e.g.*, *Shaw v. New Castle County*, No. 20cv950, 2021 WL 4125648, at *2 (D. Del. Sept. 9, 2021) (collecting cases).

Accordingly, the claims against the County are also dismissed with prejudice.

### ***C. The MCES Defendants' Motion to Dismiss***

Next, Smith sues Dr. Sarkar, Dr. Santana, and MCES under § 1983 for violating her Fourteenth Amendment right to due process and for retaliation and conversion in violation of 42 U.S.C. §§ 12203 and 12188. (Doc. No. 13 at 16–19.) Smith also brings state law claims for gross negligence, defamation, and false imprisonment. (*Id.*) When describing these claims, Smith vehemently opposes the structure established by the MHPA. (*See, e.g.*, Doc. No. 13 at 17 ("I point-out [sic] here that it is cheaper for the State of Pennsylvania and local governments to lock people up in mental institutions because no public defenders are required, no bail, no arraignments, no jury trial and only fake mental health court where there are no rules of evidence [and] where hear-say evidence and psychology evidence based on statistics rule the day."); *id.* at 18 (referring to "the phony 303 hearing" and the "fake Montgomery County kangaroo court judge"); *id.* at 19 ("MCES is operating what is effectively an illegal 'Impressments Gang.' To wit, to sweep-up ne'er-do-well people or people who are different and thus 'troublesome,' under

the [MHPA] in order to collect these person's health insurance . . . to finance continuation of their mental health infrastructure" and to "avoid actually arresting these people under criminal laws" and providing due process.).) That said, the Court has been able to discern some allegations tying Smith's claims to the actions of these specific Defendants. Notably, she alleges that Drs. Sarkar and Santana "interfere[d] with the Plaintiff's freedom" when "Dr. Sarkar ordered the plaintiff to be incarcerated in the MCES mental health institution . . . without giving the plaintiff a chance to deny the allegations made by Officer Keith" in his 302 Application and when Dr. Santana "called the plaintiff false made-up personally types: psychotic, paranoid and delusional" during the 303 Hearing. (*Id.* at 16–19.) Smith claims "MCES is the ultimate responsible party for the official behavior of its employees and contractors," including both doctors. (*Id.* at 19.)

The MCES Defendants argue that Smith's § 1983 claims fail because they are not state actors subject to liability under § 1983. (Doc. No. 17 at 6–8.) The Court agrees. As a reminder, § 1983 creates a private cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) ("Our cases have accordingly insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State."); *Janicsko v. Pellnam*, 774 F. Supp. 331, 339 (M.D. Pa. 1991) ("[T]he complained of action in a § 1983 case must be one that is 'fairly attributable to the state,' and not to some private actor."). In *Janicsko*, the district court analyzed at length whether a private hospital is a state actor when it involuntarily commits an individual pursuant to the MHPA. 774 F. Supp. at 335–39. Finding that the MHPA neither

"replaces private physician or facility discretion with state mandated standards," nor "compels or encourages a facility's or physician's actions with regard to involuntary commitment," the court held that the hospital and its physicians were not state actors and "no cause of action" could "be stated under § 1983" against them. *Id.*; *see also Bodor v. Horsham Clinic, Inc.*, 1995 WL 424906, at * (E.D. Pa. July 19, 1995) (finding that a private hospital was not a state actor under the Supreme Court's close nexus test, government/state compulsion test, public/government function test, or symbiotic relationship test because (1) the only conduct connecting the hospital to the state was the hospital's compliance with the MHPA, (2) nothing in the MHPA "compels or encourages involuntary commitments," (3) "the commitment of the mentally ill has not been a traditional and exclusive function of the Commonwealth," and (4) "there was no interdependence between the private defendants and the Commonwealth").

Numerous courts in this Circuit have cited *Janicsko* with approval and followed its lead. *See, e.g.*, *Carver v. Plyer*, 115 F. App'x 532, 538–639 (3d Cir. 2004) ("In *Janicsko v. Pellman*, 774 F. Supp. 331, 337–38 (M.D. Pa. 1991), *aff'd*. 970 F.2d 899 (3d Cir. 1992), which we recently cited with approval . . . , the court held that although the MHPA contains language which states that a mental health professional 'shall' treat an individual if it is determined that emergency treatment is necessary, the actual determination of whether treatment is necessary is sufficiently discretionary so as not to compel any particular action. We [previously] adopted this reasoning and accordingly hold that St. Luke's [Hospital] was not compelled by the MHPA to commit and treat Carver and cannot therefore be considered a state actor in this case." (internal citation omitted)); *Guilday*, 2022 WL 612865, at *6 ("The express language of the MHPA . . . leaves the decision whether to examine or treat individuals involuntarily to the discretion of the examining physicians . . . . For the reasons stated above, Plaintiff cannot sue the Crozer-Chester

Defendants for constitutional violations under Section 1983 because their actions cannot be ‘fairly attributed’ to the Commonwealth.”); *Kush v. Bayview Loan Servicing*, No. 18cv1483, 2019 WL 2387081, at *2 (M.D. Pa. June 6, 2019) (“Additionally, insofar as plaintiff alleges that WB Hospital violated her constitutional rights by having her involuntarily committed for 20 days, the law is clear that hospitals who exam and treat persons suspected of being ‘severely mentally disabled and in need of immediate treatment,’ pursuant to Sections 302 and 303 of the MHPA, are not state actors for purposes of a claim under § 1983.”); *Davenport v. Pottstown Hosp. Co., LLC*, No. 17cv1616, 2017 WL 3038254, at *6 (E.D. Pa. July 18, 2017) (“Mr. Davenport does not allege the Hospital acted under color of state law when it allegedly failed to train/supervise its employees because the [MHPA] does not coerce the Hospital to train or supervise its employees. Mr. Davenport fails to state a *Monell* claim against the Hospital because we have no facts showing the Hospital is a state actor.”); *Savacool v. Del. Cnty. Dep’t of Mental Health & Mental Retardation*, No. 92cv2142, 1993 WL 21209, at *2–6 (E.D. Pa. Jan. 25, 1993) (“This court similarly finds that the Lankenau Hospital Defendants were not acting as state agents in the involuntary commitment of Joan Savacool.”).

As in Smith’s previous action, *see Smith*, 2022 WL 3139854, this Court is persuaded by the reasoning of *Janicsko*, *Carver*, and similar opinions, and we find that Smith has failed to allege facts which suggest that MCES, Dr. Sarkar, or Dr. Santana is a state actor subject to liability under § 1983.[10] Because the MCES Defendants were not acting under color of state

[10] Smith argues that *Janicsko* is not fatal to her § 1983 claims because “[b]esides being a state actor, a person can be acting under the color of state law . . . state actors AND people acting under the color of state law, like the MHPA, can be sued.” (Doc. No. 31 at 9.) But, as noted by the cases cited above, courts in this Circuit have consistently held that a private actor, *even if complying with the MHPA*, is not “acting under color of state law” for purposes of § 1983.

law, the federal constitutional and statutory claims asserted against them pursuant to § 1983 fail and are dismissed with prejudice.

In addition to seeking dismissal of Smith's § 1983 claim, the MCES Defendants also seek dismissal of Smith's state law claims for gross negligence, defamation, and false imprisonment against them on immunity grounds. (Doc. No. 17 at 9–11 (citing 50 Pa. Stat. & Cons. Stat. § 7114).) Smith's opposition brief does not address these arguments (*see* Doc. No. 31 at 9 (responding to state law arguments by stating that her "lawsuit is a federal civil rights lawsuit" under § 1983[11])), so the Court finds the state law claims abandoned. *See Dooley*, 2022 WL 21757166, at *4; *Breslow*, 2022 WL 18585319, at *1 n.1. And when a plaintiff has abandoned their claims, dismissal is with prejudice. *See, e.g.*, *Shaw*, 2021 WL 4125648, at *2.

Accordingly, the claims against the MCES Defendants are also dismissed with prejudice.

### ***D. Township Defendants' Motion to Dismiss***

Last, Smith brings a §1983 claim against Officer Keith, unidentified John Doe officers, and Lower Merion Township, alleging violations of her Fourth Amendment right to be free from unlawful seizures. (Doc. No. 13 at 11–16.) She also brings state law claims for defamation against Officer Keith and the Township and claims for gross negligence against Officer Keith and the Doe Defendants. (*Id.*)[12] Smith's claims against the Township largely mimic her claims against Montgomery County. She claims the Township is "responsible for the liability" of

---

[11] To the extent Smith intends to bring § 1983 claims premised on violations of state law, those claims fail because § 1983 "provides a remedy for the violation of rights created by *federal* law." *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (emphasis added).

[12] Smith also claims that Officer Keith violated 28 U.S.C. § 4101 in a claim that she labels "Defamation of Character." Section 4101 is the definitions section for a federal statute that limits the extent to which a domestic court can "recognize or enforce a foreign judgment for defamation." 28 U.S.C. § 4102(a)(1). Smith does not seek recognition or enforcement of a foreign court's defamation determination, so this statute is inapplicable, and the Court does not discuss it further.

Officer Keith and the Doe Defendants and alleges that the Township "has a long standing [sic] voluntary policy of assisting defendant MCES with arresting people on MCES' mental health warrants on merely hearsay statements" and a policy of "condition[ing] their police officers to ignore their oath to support and defend people's U.S. Constitutional civil rights." (*Id.* at 15.) The Township Defendants move to dismiss these claims, arguing that Smith has not alleged a violation of her constitutional rights and that even if she has, they are immune from suit. The Court addresses Smith's claims against Officer Keith before turning to her derivative claims against the Doe Defendants and the Township.

**1. Officer Keith**

As noted above, Smith claims Officer Keith, by drafting the 302 Application, placing Smith in handcuffs, transporting her to MCES, and testifying at the 303 Hearing violated her Fourth Amendment right to be free of unreasonable seizures.[13] (Doc. No. 13 at 11.) The Township Defendants argue that Smith has failed to allege any violation of her constitutional rights by Officer Keith and that even if she had, Officer Keith is entitled to qualified immunity. The Court agrees.

"The Fourth Amendment applies to seizures in civil, as well as criminal, proceedings." *Doby*, 171 F.3d at 871. However, a state "may act without a warrant and without probable cause in situations where 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Id.* (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)). In *Doby*, the Third Circuit held that "the temporary involuntary

---

[13] Smith alleges that by placing her in handcuffs, Officer Keith falsely imprisoned her in violation of the Ninth Amendment to the United States Constitution. (Doc. No. 13 at 12.) As discussed previously, the Ninth Amendment is inapplicable here. *See supra* n.6. Instead, the Court interprets this claim as an extension of Smith's claim for unreasonable seizure.

commitment of those deemed dangerous to themselves or others qualifies as a 'special need' permitting the state to act without a warrant." 171 F.3d at 871 (noting that "emergency cases" like those covered by § 302 "present a situation where seeking a warrant is *systematically* impracticable"). Thus, Officer Keith did not need to "have probable cause, nor . . . obtain a warrant, prior to initiating involuntary commitment proceedings" against Smith. *Iwanejko v. Cohen & Grigsby, P.C.*, 03cv1855, 2006 WL 2659109, at *9 (W.D. Pa. Sept. 15, 2006);

Although he was not required to obtain a warrant, Officer Keith's conduct must still have been "reasonable under the circumstances." *Doby*, 171 F.3d at 872 (explaining that the "fundamental inquiry" in the civil confinement context is "whether the government's conduct is reasonable under the circumstances"). Smith argues his conduct was unreasonable because his 302 Application included "lies" and "false[ ] impli[cations]." (Doc. No. 13 at 11, 13.) The Township Defendants respond that although Smith disputes some of the facts in the 302 Application, she "cannot dispute the bulk of the narrative" or show that Officer Keith's conclusions were unreasonable given "the information presented to him and which he observed." (Doc. No. 20-2 at 16.) The Court agrees with the Township Defendants.

As detailed earlier in this Memorandum, Officer Keith submitted a lengthy narrative with his 302 Application. In her opposition brief, Smith provides a line-by-line response to that narrative (Doc. No. 29 at 4–9), which concedes nearly all of the material facts, including Officer Keith's assertions that:

- Smith called and emailed the Lower Merion Police Department upwards to 50 times over many months to report what she perceived as harassment, including her belief that a nondescript white man was stalking her.
- In mid-2022, she was "threatened by the stalker"—who was discussing whether to place "chiggers" in Smith's "rental vehicle"—from the adjacent room in a hotel where she was staying.
- In February 2023, hundreds of "chigger-spider[s]" were placed in her new car.

- At some point in 2023, "a buddy of a stalker shouted up to her" apartment that he was "a soldier for the Gambino Crime Family."
- In August 2023, this "soldier" "shot [Smith] with a focused sound weapon." Smith later describes this incident as her being attacked with a "laser or maser . . . on the NJ Turnpike" and "shot . . . in the head with a focused sound weapon."
- Smith told Officer Kieth that she was taking Diazepam with alcohol in an attempt to "sleep through [the] unpleasant sound" that "the Stalker and his criminal buddies" were "blasting" at her apartment from the apartment next door.
- On the morning of November 3, 2025, Smith took a firearm with her on the way to work because the night before, she had heard the "soldier" and others in the apartment below her discussing her, and when she left her apartment the next morning, she took the gun to "discourage any unwanted confrontation."
- There were "two heavy boxes of long gun ammunition" in Smith's car when she met Officer Keith on November 3.
- When Officer Keith took Smith to MCES, she continued to speak to him about "the Mafia setting her up."

(*Id.*) Although Smith argues that there is an innocent explanation for most of these facts and takes issue with Officer Keith's phrasing in the 302 Application (phrasing which she asserts was meant to "deliberately . . . make [her] seem nuts"), she does not dispute the facts themselves, which show that: (1) Smith had for many months been reporting that an unidentified "stalker" and "soldier" had been conspiring to harm her, shooting her with laser/sonic weapons, and placing chiggers in her vehicles;[14] and (2) Smith had grown so concerned that she had escalated to traveling with a weapon and ammunition. Given these facts, it was reasonable for Officer Keith to believe that Smith may have been a danger to herself or others, such that she could be detained, transported to MCES and, within two hours, evaluated by a physician. *See Doby*, 171 F.3d at 872 ("Fourth Amendment doctrine provides that 'the shorter the detention, the less

[14] It is immaterial whether the underlying facts actually occurred or were the product of paranoid delusions. What matters is that it was not unreasonable for Officer Keith to believe Smith's reports may have been the product of delusions, such that she could be briefly be detained for evaluation by a physician.

compelling is the evidence of the necessity for it that the authorities need to produce."); *cf. Iwanejko*, 2006 WL 2659109, at *10 (finding the plaintiff's "involuntary commitment was proper under the 'special needs' doctrine" because "although there are disputes of fact regarding the extent of his violent behavior, the Officers were informed of sufficient evidence of same to conclude that he was either a danger to himself, or others, or both. Therefore, the Court finds that Plaintiff cannot establish a violation of his Fourth Amendment rights"). Because Officer Keith did not violate Smith's Fourth Amendment rights, Smith's § 1983 claim against him fails, and because this is not a claim that can be cured by amendment, it is dismissed with prejudice.

In addition to seeking dismissal of Smith's § 1983 claim, Officer Keith also seeks dismissal of Smith's state law defamation claim as time barred. (Doc. No. 20-2 at 22.) In Pennsylvania, a claim for defamation must be filed within one year. 42 Pa. Stat. & Cons. Stat. § 5523(1). In Smith's opposition brief, she concedes that this action was initiated, at the earliest, on October 21, 2025 (*see* Doc. No. 29 at 1 (explaining that this is when Smith paid the filing fee)), which is nearly two years after Officer Keith made the allegedly defamatory statements in the 303 Application and during the 303 Hearing. Accordingly, the defamation claim is dismissed with prejudice.

Finally, Officer Keith seeks dismissal of Smith's state law claim for gross negligence on the grounds that he is immune from suit. (Doc. No. 20-2 at 19 (referencing 50 Pa. Stat. & Cons. Stat. § 7114(a)).) The MHPA provides immunity for authorized individuals who "participate[ ] in a decision that a person be examined or treated under this Act." 50 Pa. Stat. & Cons. Stat. § 7114(a). "In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized individual . . . shall not be civilly or criminally liable for such decision or for any of its consequences." *Id.*

"Pennsylvania law defines gross negligence in the context of the MHPA as 'facts indicating more egregiously deviant conduct than ordinary carelessness, inadvertence, laxity or indifference.'" *Doby*, 171 F.3d at 875 (quoting *Albright v. Abington Mem. Hosp.*, 696 A.2d 1159, 1164 (Pa. 1997)). "'The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care.'" *Id.* (quoting *Albright*, 696 A.2d at 1164). And a person engages in willful misconduct "when 'the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong.'" *Id.* (quoting *Krivijanski v. Union R.R. Co.*, 515 A.2d 933, 937 (Pa. Super. Ct. 1986)).

Smith argues that Officer Keith is "guilty of gross negligence" because his 302 Application is based on "many lies, distortions, half truths, inaccurate statements and speculative assumptions." (Doc. No. 29 at 2.) But, as noted above, Smith does *not* dispute the material facts within the 302 Application, and we cannot find Smith's disagreement with Officer Keith's phrasing and the inferences that he drew from those facts demonstrates a "flagrant" deviation from the ordinary standard of care. *Doby*, 171 F.3d at 875. Smith also takes issue with the fact that Officer Keith did not "provide any evidence to support anything he said in his 302 narrative" or during his "oral testimony at the related 303 hearing." (Doc. No. 29 at 3.) But nothing in the MHPA demands that the application be supported by affirmative "evidence." Instead, § 302(a)(2)—which outlines the procedures governing "emergency examination without a warrant"—states that a police officer who "*upon personal observation* of the conduct constituting reasonable grounds that [the individual] is severely mentally disabled and in need of immediate treatment . . . may take such person to an approved facility for an emergency examination." 50 Pa. Stat. & Const. Stat. § 7302(a)(2) (emphasis added). Here, although Officer

Keith did not witness every incident discussed in his 302 Application, he: (1) knew that Smith had submitted dozens of communications to the Police Department about the underlying incidents involving the "stalker" and "soldier" and that her concerns appeared to be escalating; (2) personally communicated with Smith about these concerns; (3) received the phone calls from Smith's office about Smith taking an unloaded firearm to work on November 3 and the reasons she had done so, (4) spoke with Smith on the night of November 3 and saw that she had boxes of ammunition in her car, and (5) heard Smith's continued concern that the mafia set her up. Given Officer Keith's personal observations—which the MHPA states are sufficient on their own—the Court finds Officer Keith was not required to support his 302 application and 303 testimony with affirmative evidence. 50 Pa. Stat. & Cons. Stat. § 7302(a)(2). He certainly was not grossly negligent for failing to do so.

Because Smith's allegations show that Officer Keith is immune from suit on Smith's state law claims, those claims are also dismissed with prejudice.

**2. <u>The Doe Defendants and Lower Merion Township</u>**

Smith's § 1983 claims against the Township and the Doe Defendants are derivative of her constitutional claim against Officer Keith, with Smith contending that the Doe Defendants "encouraged defendant Officer Keith" to violate Smith's constitutional rights and that "Lower Merion Township is the principle responsible party for . . . deprivations of the plaintiff's U.S. Constitutional civil rights by members of the Lower Merion Township Police Department perpetrated by them while on duty." (Doc. No. 13 at 15.) Because the Court finds no underlying constitutional violation as to Officer Keith, Smith's § 1983 claims against the Doe Defendants and the Township also fail and are dismissed with prejudice.[15] *See Mulholland v. County of*

[15] In the alternative, the Court finds that Smith once again premises municipal liability on a theory of *respondeat superior*, "which cannot serve as a basis for a § 1983 claim against a local government."

*Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim."); *cf. Callaway v. Small*, 576 F. Supp. 3d 232, 243–44 (D.N.J. 2021) (finding the plaintiff's failure to intervene claim against one officer failed because he "has not alleged that [the officer] witnessed a constitutional violation").

As for the state law claims, Smith's only allegations against the Doe Defendants are that they "egged on" Officer Keith. That conduct does not rise to the level of gross negligence, meaning they too are entitled to immunity under § 7114(a)(2). And Smith's sole state law claim against the Township is for defamation, which, as noted with respect to Officer Keith, is time barred. 42 Pa. Stat. & Cons. Stat. § 5523(1). Accordingly, Smith's state law claims against the Doe Defendants and the Township are dismissed with prejudice.

## V. CONCLUSION

For those reasons, Defendants' motions to dismiss are granted. An appropriate order follows.

---

*Smith*, 2022 WL 3139854, at *15 (citing *Monell*, 436 U.S. at 692). A municipality, like the Township, may be sued under § 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. The only policy and custom that Smith identifies in the Third Amended Complaint is the Township's "voluntary policy" of "assisting defendant MCES with arresting people on MCES' mental health warrants" and acting with "deliberate indifference to deny [Smith her] U.S. Constitutional due process in a real court." (Doc. No. 13 at 15.) But when a local government is "merely enforcing state law, without adopting any particular policy of its own, it cannot be held liable under the *Monell* line of cases." *Doby*, 171 F.3d at 867.